**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 5, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

COLORADO DEPARTMENT OF
PUBLIC HEALTH AND
ENVIRONMENT, HAZARDOUS
MATERIALS AND WASTE
MANAGEMENT DIVISION,

      Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,
UNITED STATES DEPARTMENT OF
DEFENSE, LEON E. PANETTA, as
United States Secretary of Defense,
FRANK KENDALL, Under Secretary of
Defense for Acquisition, Technology and
Logistics, ASSEMBLED CHEMICAL
WEAPONS ALTERNATIVES
PROGRAM, CONRAD F. WHYNE, as
Acting Program Manager of Assembled
Chemical Weapons Alternatives Program,
UNITED STATES DEPARTMENT OF
THE ARMY PUEBLO CHEMICAL
DEPOT, TIMOTHY M. GREENHAW,
Lieutenant Colonel, as Commander of
United States Department of the Army
Pueblo Chemical Depot,

      Defendants - Appellees.

No. 09-1554

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:08-CV-01883-RPM)**[1]

---

David E. Kreutzer, First Assistant Attorney General (John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Richard E. Lotz, Assistant Attorney General, with him on the briefs), Denver, Colorado for Plaintiff-Appellant.

Maggie B. Smith (Ignacia S. Moreno, Assistant Attorney General, Lisa E. Jones, Alan D. Greenberg, Sambhav N. Sankar, with her on the brief), United States Department of Justice, Washington D.C. for Defendants-Appellees.

---

Before **LUCERO, EBEL,** and **HARTZ,** Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Since the 1950s, the United States has stored chemical weapons at the Army's weapons depot located near Pueblo, Colorado ("Depot"). Congress has now mandated that the Army destroy those weapons by 2017. Separately, Congress authorized the State of Colorado to regulate hazardous waste in that state. Invoking that regulatory authority, Plaintiff-Appellant Colorado Department of Public Health and Environment, Hazardous Materials and Waste Management Division ("Colorado" or "CDPHE"), has declared the chemical weapons stored at the Depot awaiting destruction to be hazardous waste. In this

---

[1] Pursuant to Fed. R. App. P. 43(c), Secretary of Defense Leon E. Panetta is substituted as a defendant for former Secretary Robert M. Gates, Under Secretary of Defense Frank Kendall is substituted for former Under Secretary John J. Young, Jr., Assembled Chemical Weapons Alternatives Program Manager Conrad F. Whyne is substituted for former manager Kevin Flamm, and Lieutenant Colonel Timothy M. Greenhaw is substituted for Lieutenant Colonel Robert Wittig.

action, Colorado seeks to enforce against the Depot Colorado's regulation prohibiting storage of any hazardous waste.

The specific question presented by this appeal is whether Congress's mandate that the Army destroy these chemical weapons at the Depot by 2017 preempts Colorado's enforcement against the Depot of its regulation prohibiting storage of any hazardous waste. This case thus lies at the intersection of congressional mandates that, under these circumstances, support opposing positions. Based on the fact that Congress 1) delegated to Colorado the authority to regulate hazardous waste, so long as the State's regulations are at least as stringent as federal hazardous waste regulations, and 2) required federal agencies to follow such state hazardous waste regulation, Colorado argues that the United States, in operating the Depot, must comply with the State's prohibition against storing hazardous waste. Based instead on the fact that Congress mandated that the Army destroy the chemical weapons at the Depot and gave the Army until 2017 to complete their destruction, the United States argues it cannot comply with Colorado's regulation prohibiting the storage of any hazardous waste.

This difficult case requires us, then, to choose between opposing congressional mandates. Ultimately we are persuaded by the detailed manner with which Congress has addressed and mandated the destruction of the chemical weapons stored at the Depot to conclude that that federal law preempts Colorado's attempt to regulate that destruction process by enforcing its prohibition of the storage of hazardous waste against the Depot. Therefore, having jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court's decision to dismiss Colorado's claims against the United States.

## I.  BACKGROUND

### A.  Colorado's federally-derived authority to regulate hazardous waste

In 1976, Congress enacted the Resource Conservation and Recovery Act ("RCRA"), see 42 U.S.C. §§ 6901-6992k, in part to establish "a comprehensive regulatory scheme for the transportation, treatment, and disposal of hazardous wastes." United States v. Magnesium Corp., 616 F.3d 1129, 1131-32 (10th Cir. 2010) (citing RCRA's Subtitle C, codified at 42 U.S.C. §§ 6921-6939f).  Congress charged the federal Environmental Protection Agency ("EPA") with administering RCRA.  See United States v. Power Eng'g Co., 303 F.3d 1232, 1236 (10th Cir. 2002).  Nevertheless, a state can apply to the EPA "for authorization to administer and enforce its own hazardous waste program [so long as] its program is equivalent to the federal program and provides adequate enforcement."  Id.; see 42 U.S.C. § 6926(b).

Colorado has enacted its own hazardous waste program, see Colorado Hazardous Waste Management Act ("CHWMA"), Colo. Rev. Stat. §§ 25-15-301 to -327, and in 1984, the EPA authorized Colorado "to operate its hazardous waste program in lieu of the federal program," 49 Fed. Reg. 41,036 (Oct. 19, 1984).  See also United States v. Colorado, 990 F.2d 1565, 1571 (10th Cir. 1993).  CDPHE administers Colorado's hazardous waste management program.

Colorado has promulgated regulations to implement CHWMA.  See Colo. Rev. Stat. § 25-15-302(2).  Most relevant here, 6 Colo. Code Regs. § 268.50, like its federal counterparts, see 42 U.S.C. § 6924(j); 40 C.F.R. § 268.50(a)(2), (b), (c), generally prohibits the storage of "hazardous wastes" which are restricted from land disposal.

4

6 Colo. Code Regs. § 268.50(a).[2]

A state can adopt "more stringent" regulations than federal law requires. 42 U.S.C. § 6929; see also Colorado, 990 F.2d at 1569. Thus, "RCRA sets a floor, not a ceiling, for state regulation of hazardous wastes." Safety-Kleen, Inc. v. Wyche, 274 F.3d 846, 863 (4th Cir. 2001) (quotation omitted). Important here, however, a state's authority to enact more stringent hazardous waste regulations does not insulate the state's regulations from federal-law preemption. See Blue Circle Cement, Inc. v. Bd. of Cnty. Comm'rs, 27 F.3d 1499, 1504-05 (10th Cir. 1994); ENSCO, Inc. v. Dumas, 807 F.2d 743, 744-45 (8th Cir. 1986). Therefore, a state's "more stringent" hazardous waste regulation may still be preempted if, for example, it frustrates the purpose or objective of a federal law. See Blue Circle Cement, 27 F.3d at 1504-09 (citing cases); ENSCO, 807 F.2d at 744-45. This conclusion, that federal law can preempt conflicting state hazardous waste regulations, is consistent with RCRA's savings provision, which provides only that "[n]othing in this subchapter [referring to RCRA 42 U.S.C. §§ 6901-6992k] shall be construed to prohibit any State or political subdivision thereof from imposing any requirements, including those for site selection, which are more stringent than those

---

[2] Section 268.50 permits "[a]n owner/operator of a hazardous waste treatment, storage, or disposal facility" to store hazardous wastes which are restricted from land disposal "solely for the purpose of" accumulating enough waste "to facilitate proper recovery, treatment, or disposal," and the regulation sets forth parameters and requirements for doing so. 6 Colo. Code Regs. § 268.50(a)(2), (b), (c). Here, however, there is no dispute that the Depot has already accumulated a sufficient number of chemical weapons to permit their "proper recovery, treatment, or disposal," so storage for that purpose is not at issue.

imposed by [federal] regulations."[3]  42 U.S.C. § 6929 (emphasis added).

Pursuant to the Federal Facilities Compliance Act, the federal government and its agencies must comply with an EPA authorized state program regulating hazardous waste, such as Colorado's, "'to the same extent, as any person . . . .'"  Colorado, 990 F.2d at 1569 (quoting 42 U.S.C. § 6961(a)).  The United States has thus waived its sovereign immunity from state-imposed permit requirements, as well as conditions imposed by the state for the storage, treatment and disposal of hazardous waste.  See United States v. New Mexico, 32 F.3d 494, 495, 497 (10th Cir. 1994); Colorado, 990 F.2d at 1569 n.4. This waiver of sovereign immunity, however, again does not insulate a state regulation from federal preemption.

## B.  The Pueblo Chemical Depot

The Depot is one of several Army installations where the United States stores chemical weapons.  Currently, the Army is storing "more than 2600 tons of . . . mustard agent in mortars and projectile munitions" at the Depot, in ninety-eight "igloos," which are "earthen-covered concrete structures."  (Aplt. App. at 82; Aple. Supp. App. at 36 ¶ 3; 55 ¶ 3.)  Four of these ninety-eight igloos contain leaking chemical weapons and "contaminated personal protective equipment."[4]  (Aplt. App. at 83.)  The other ninety-

---

[3] State regulation that is more stringent than federal hazardous waste regulations can also be preempted by RCRA if the state regulation frustrates Congress's overall purposes in enacting RCRA.  See Blue Circle Cement, 27 F.3d at 1504-09 (citing cases).  See infra at 9 & n.5.  Congress's frequent extensions of time to destroy the mustard agent stored at the Depot were not incorporated into RCRA.

[4] Out of the 780,000 munitions stored at the Depot, the Army has found ninety-three to be leaking.

6

four igloos contain chemical munitions that remain usable as weapons.

**C. Congress's mandate that the Department of Defense destroy the United States' stockpile of chemical weapons**

In 1985, Congress directed the Secretary of Defense ("Secretary") to destroy the United States' then-existing stockpile of chemical weapons. 50 U.S.C. § 1521(a). In 1994, Congress forbade the Secretary from transporting "any chemical munition that constitutes part of the chemical weapons stockpile out of the State in which that munition [wa]s located on October 5, 1994." Id. § 1512a(a). Thus, Congress has mandated that the Department of Defense ("DOD") destroy the Depot's chemical weapons in Colorado.

Congress further directed the Secretary, in destroying these weapons, to

provide for--

> (A) maximum protection for the environment, the general public, and the personnel who are involved in the destruction of the lethal chemical agents and munitions . . . , including but not limited to the use of technologies and procedures that will minimize risk to the public at each site; and
>
> (B) adequate and safe facilities designed solely for the destruction of lethal chemical agents and munitions.

Id. § 1521(d)(1) (2011).

In order to comply with Congress's directive to destroy the United States' chemical weapons, the DOD originally intended to incinerate these weapons. See Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army, 111 F.3d 1485, 1487-88 (10th Cir. 1997). Before doing so, however, Congress required that the Army conduct testing to verify the viability of this method of destruction. See 50 U.S.C. § 1521(k) (1990; subsequently amended); see also Chem. Weapons Working Grp., 111 F.3d at 1487-88.

7

By 1993, the Army had determined that it could incinerate the chemical weapons. See Chem. Weapons Working Grp., 111 F.3d at 1487-88. Several storage sites other than the Depot then began the process of building incineration plants and incinerating their stored chemical weapons.

In 1996, however, Congress directed the DOD to explore alternative methods of destroying these chemical weapons. After considering available alternatives, the DOD, in 2002, decided to "neutraliz[e]" and then "biotreat[]" the Depot's chemical weapons. (Aplt. Br., attach. 10.) That same year, the DOD contracted with "Bechtel Pueblo Team" to design, build, and operate a neutralization plant at the Depot. (Aplt. App. at 28 ¶ 9; 85 ¶ 9.) The Bechtel Pueblo Team broke ground on the plant in September 2004. The following month, however, the DOD suspended design work on the plant and, in January or February 2005, the DOD suspended construction. Construction resumed in March 2005 on a scaled down version of the plant.

Initially, Congress directed that the Secretary of Defense destroy the United States' chemical weapons by September 30, 1994, or instead by the date called for in "a treaty banning the possession of chemical agents and munitions," if the United States ratified such a treaty. Pub. L. 99-145, 99 Stat. 583, § 1412(b)(1), (2) (Nov. 8, 1985). Congress has since extended that destruction deadline several times. And, in April 1997, the United States ratified the Chemical Weapons Convention treaty, which calls for the elimination of these weapons by 2012. Congress has currently extended the time the Secretary has to destroy these chemical weapons to the treaty's 2012 deadline, or "not

later than December 31, 2017."[5] 50 U.S.C. § 1521(b)(3) (2011). In the meantime, the Secretary must make annual and semi-annual reports to Congress regarding, among other things, the construction and operation of facilities to destroy chemical weapons, the anticipated schedule for the completion of the weapons destruction, and an assessment of the safety and integrity of the stockpile of chemical weapons awaiting destruction. See id. § 1521(i), (j).

**D. Colorado's attempts to regulate the chemical weapons stored at the Depot**

In 1980, while the EPA was still administering RCRA in Colorado, the Army notified the EPA that it was storing hazardous waste at the Depot in the form of leaking weapons and contaminated protection equipment. The EPA issued the Depot an interim permit to store this waste. In 1992, after the EPA turned the regulation of hazardous waste in Colorado over to the State, see 49 Fed. Reg. 41,036 (Oct. 19, 1984), Colorado issued the Army a ten-year permit to store this hazardous waste in four specified igloos.[6] In 2002, Colorado renewed that permit through September 2012. The parties thus refer to these four igloos as the "Permitted Igloos" (Aplt. App. at 26 ¶ 3; 85 ¶ 3), and do not dispute that the leaking chemical weapons and contaminated protective equipment contained in these Permitted Igloos qualify as hazardous waste restricted from land

---

[5] According to the United States, Congress has amended 50 U.S.C. § 1521 on "at least fourteen occasions" and has changed the deadline for completion of the destruction of these weapons at least six times. (Aple. Br. at 4, 6-7.)

[6] Like federal law, see 42 U.S.C. § 6925, Colorado requires "[a]ny site or facility for the treatment, storage, or disposal of hazardous waste" to have a permit, Colo. Rev. Stat. § 25-15-303(1).

9

disposal.

In 1985, as previously mentioned, Congress directed the Army to destroy all chemical weapons being stored at the Depot (and elsewhere). Twenty years later, however, after continued delay in the construction of the Depot's neutralization plant, the CDPHE, on June 14, 2005, informed the Depot for the first time that Colorado deemed the Depot's non-leaking and still usable chemical munitions to be hazardous waste restricted from ground disposal and, therefore, directed the Depot, within thirty days, to apply for a Part A permit to store such hazardous waste.

> Under Colorado law,
>
> [t]o obtain [such] a permit an applicant submits a Part A application, providing a general description of the applicant's facility and hazardous waste management activities. More detailed information is required in a Part B application. Upon receipt of the Part A application, [Colorado] may allow the storage of hazardous waste on an interim basis. A final permit[, however,] will issue only upon [Colorado's] approval of an applicant's Part B submission.

(Id. at 143 (district court's order).)

In response to Colorado's order that the Depot apply for a permit pertaining to the usable chemical weapons stored at the Depot, the Depot's commander protested to the CDPHE that the non-leaking chemical weapons did not qualify as hazardous waste and, therefore, were not subject to regulation by Colorado. Nevertheless, on July 27, 2005, the Depot belatedly applied for a Part A hazardous waste permit to store these usable chemical munitions. In applying for that permit, however, the Depot declared that it was submitting its permit application only "as a matter of comity, and pending further action," after noting that the Depot's "longstanding and continued cooperation with CDPHE is

10

essential to meet treaty obligations and remain on the path to progress." (Aple. Supp. App. at 40.)

Six months later, CDPHE issued a compliance order effective February 13, 2006 (the "2006 compliance order"). This order determined that the Depot had violated Colorado's hazardous waste regulations by 1) not timely submitting a Part A permit application as directed and, thus, storing hazardous waste without a permit, and 2) delaying the construction of the Depot's neutralization plant. Nevertheless, CDPHE's 2006 compliance order gave the Depot "interim status" to store hazardous waste in what the parties refer to as the ninety-four "Interim Status Igloos." (Aplt. App. at 31 ¶ 22.) The DOD did not administratively appeal the 2006 compliance order.

That compliance order further required the Depot, among other things, to submit a treatment plan to Colorado that would describe the means by which the chemical munitions would be treated and neutralized, along with a schedule for when that would occur. The order further required that the submitted treatment schedule insure that the neutralization plant would be constructed by September 30, 2007, and that all of the chemical weapons stored at the Depot would be destroyed "by April 29, 2012, or as specified in the Plan submitted [by the Depot to Colorado before] September 30, 2006, or as subsequently modified in annual reports" that the Depot was to file with the CDPHE. (Aple. Supp. App. at 19.)

In an effort to comply with this order, the Depot submitted a treatment plan to Colorado in September 2006 calling for the complete destruction of the chemical weapons by 2020. In 2007, the Depot amended its plan, indicating instead that the

11

weapons would not be completely destroyed until 2021. These dates are well beyond the congressionally mandated December 2017 destruction deadline. See 50 U.S.C. § 1521(b)(3) (2011).

Dissatisfied with the Depot's projected destruction dates, CDPHE, on June 16, 2008, issued another compliance order (the "2008 compliance order") requiring the Depot to submit a new plan that 1) provided for the complete neutralization of all of the Depot's chemical weapons by December 31, 2017, and 2) further provided for interim deadlines enforceable against the Depot. This time the Depot filed an administrative appeal challenging this 2008 compliance order. CDPHE then withdrew its 2008 compliance order and initiated this litigation.

## E. Procedural background

In this litigation, Colorado sued a number of defendants (collectively the "United States"), seeking to compel compliance with the State's hazardous waste regulation. Specifically, Colorado alleged that the United States was not complying with 6 Colo. Code. Regs. § 268.50, which prohibits the storage of any hazardous waste that has been restricted from land disposal. Colorado asserted two claims for relief based upon this theory, the first claim alleging that the Depot's storage of usable chemical weapons in the ninety-four "Interim Status Igloos" violated § 268.50, and the second claim alleging that the Depot's storage of leaking chemical weapons and contaminated protective equipment in the four "Permitted Igloos" also violated § 268.50. As remedies, Colorado sought 1) a mandatory injunction requiring Defendants to comply with Colorado's Hazardous Waste Management Act and 6 Colo. Code Regs. § 268.50; 2) a mandatory injunction requiring

12

Defendants to submit a treatment plan to the State that would provide for destruction of the chemical munitions by December 31, 2017, as well as interim deadlines leading up to the complete neutralization of all chemical weapons located at the Depot; and 3) such other relief as the Court determines is appropriate.[7]

Colorado moved for partial summary judgment, seeking to establish Colorado's authority to regulate the chemical weapons stored at the Depot. To that end, Colorado, in

---

[7] Colorado specifically requested that the district court

> 1. Issue a mandatory injunction requiring compliance with the [CHWMA] and Regulations § 268.50;
>
> 2. Issue a mandatory injunction requiring submission to the [CDPHE] for its review and approval a Chemical Weapons Waste Treatment Plan for the treatment of all Hazardous Waste Chemical Munitions and Hazardous Waste Agent in both the Permitted Igloos and the Interim Status Igloos, and requiring such plan to include the following:
>
>> a. a complete project schedule that depicts the tasks necessary for the destruction of all Hazardous Waste Chemical Munitions and Hazardous Waste Agent at [the Depot] with a completion date of December 31, 2017; and
>>
>> b. allowance for designation of certain tasks throughout the schedule as "milestones" by the [CDPHE]. "Milestones" will be deadlines enforceable by the [CDPHE] for those tasks; and
>>
>> c. the technical rationale for the proposed schedule; and
>>
>> d. quarterly updates describing the progress made toward achieving the tasks and milestones, and any modifications or revisions to the project schedule or technical rationale contained in the Chemical Weapons Waste Treatment Plan.
>
> 3. Provide such other relief as the Court determines is appropriate.

(Aplt. App. at 20-21.)

13

its motion for partial summary judgment, asked the district court to hold, among other things, that federal law does not preempt the State's enforcement of its hazardous waste regulations against the Depot. The district court rejected that argument, concluding instead that federal law did preempt Colorado's attempt to enforce against Defendants its regulation prohibiting storage of hazardous waste. At the parties' request, the district court then entered judgment for the United States and dismissed Colorado's claims. This appeal followed.

## II.  STANDARD OF REVIEW

This court reviews the district court's summary judgment decision de novo, viewing the evidence in the light most favorable to the non-moving party. See Oldenkamp v. United Am. Ins. Co., 619 F.3d 1243, 1246 (10th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R .Civ. P. 56(a). We also review de novo the legal question of whether federal law preempts state law. See Russo v. Ballard Med. Prods., 550 F.3d 1004, 1010 (10th Cir. 2008).

## III.  PRELIMINARY MATTERS

Before considering the preemption question, we address several preliminary issues. As an initial matter, we clarify the question presented by this appeal. In its motion for partial summary judgment, Colorado asked the district court to conclude that Colorado had authority to regulate the chemical weapons stored at the Depot and, in support of that conclusion, to make four determinations. First, Colorado asked the court to decide that the CDPHE has authority generally to regulate hazardous waste in

14

Colorado, and that Congress has waived the United States' sovereign immunity, subjecting federal facilities to the State's hazardous waste regulation. The district court did not specifically address these contentions because none of the parties disputed them.

Next, Colorado asked the district court to determine both that "[t]he materials stored in the Interim Storage Igloos and the Permitted Igloos at the [Depot] are hazardous wastes," and that Colorado's regulations "prohibiting long-term storage of hazardous wastes apply to the materials stored" in those igloos. (Aplt. App. at 48.) The district court declined to resolve either of these two questions. Nor will we address them. Instead, for our purposes here only, we assume both that the materials stored in all of the igloos are hazardous waste restricted from land disposal and that Colorado's hazardous waste regulations, promulgated after the United States began storing chemical weapons at the Depot, apply to the stored materials.

The fourth issue Colorado asked the district court to determine was whether federal law preempted the enforcement of the CHWMA and its regulations against the Depot under the circumstances of this case. The district court addressed that question, deciding that under these circumstances federal law preempted application of Colorado's hazardous waste regulations to the chemical weapons stored at the Depot. That is the sole issue we address here.

One other preliminary matter we must address is Colorado's argument that the district court erred "by ruling on the Constitutional issue of preemption" before deciding the other, non-Constitutional issues presented by this case, including whether the chemical weapons stored at the Depot are hazardous waste subject to Colorado's

15

hazardous waste regulations.  (Aplt. Br. at 6.)  It was Colorado, however, that expressly

asked the district court to resolve the preemption issue.  In any event, the district court

did not err in addressing the dispositive preemption issue first.  While it is true that

federal preemption of state law is grounded in the Supremacy Clause of the United States

Constitution, the Supreme Court has treated preemption "as 'statutory' for purposes of

[the Court's] practice of deciding statutory claims first to avoid unnecessary

constitutional adjudications."  Douglas v. Seacoast Prods., Inc., 431 U.S. 265, 272

(1977); see also C.E.R. 1988, Inc. v. Aetna Cas. & Sur. Co., 386 F.3d 263, 272 n.13 (3d

Cir. 2004); Knudsen Corp. v. Nev. State Dairy Comm'n, 676 F.2d 374, 377 (9th Cir.

1982) (noting that the question of preemption "is largely one of determining the

compatibility of a state and a federal statutory scheme.  No constitutional issues of

substance are presented.").  But cf. Columbia Venture, LLC v. Dewberry & Davis, LLC,

604 F.3d 824, 828 (4th Cir. 2010) (noting that a court should decide a case on an

independent state-law basis if that basis allows the court to avoid deciding a

constitutional question such as preemption).

## IV.  PREEMPTION

### A.  Preemption principles generally

We turn now to the preemption question.  In light of the federal Constitution's

Supremacy Clause,[8] "it has long been recognized that federal law preempts contrary state

enactments."  Chamber of Commerce of the U.S. v. Edmondson, 594 F.3d 742, 765 (10th

---

[8] The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land[,] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

16

Cir. 2010); see also Arizona v. United States, 132 S. Ct. 2492, 2500 (2012). Such preemption can occur in one of three ways: 1) when a federal statute expressly preempts state law ("express preemption"); 2) where Congress intends to occupy a field ("field preemption"); and 3) to the extent that a state law conflicts with a federal law ("conflict preemption"). See Arizona, 132 S. Ct. at 2500-01; In re Universal Serv. Fund Tel. Billing Practice Litig., 619 F.3d 1188, 1195 (10th Cir. 2010).

Here, the United States invokes only conflict preemption. See Cook v. Rockwell Int'l Corp., 618 F.3d 1127, 1143 n.16 (10th Cir. 2010) (declining to address field preemption because defendants failed to develop that argument in their appellate briefs or at oral argument), cert. denied, 79 U.S.L.W. 3662 (U.S. June 25, 2012) (Nos. 10-1377, 10A845). The United States bears "the burden of showing that federal and state law conflict." Id. at 1143.

"Whatever its form, preemption analysis 'starts with the assumption that the historic police powers of the States are not to be superseded by . . . [a] Federal Act unless that is the clear and manifest purpose of Congress. Accordingly, the purpose of Congress is the ultimate touchstone of pre-emption analysis.'" Emerson v. Kan. City S. Ry. Co., 503 F.3d 1126, 1129 (10th Cir. 2007) (quoting Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992)); see also Arizona, 132 S. Ct. at 2501.

**B. Applying Colorado's regulation prohibiting storage of any hazardous waste restricted from land disposal, 6 Colo. Code Regs. § 268.50, to the Depot's chemical weapons conflicts with Congress's mandate in 50 U.S.C. §§ 1521 and 1512a**

"Conflict preemption occurs where it is impossible for a [regulated] party to comply with both state and federal requirements, or where state law stands as an obstacle

to the accomplishment and execution of the full purposes and objectives of Congress." In re Universal Serv. Fund Tel. Billing Practice Litig., 619 F.3d at 1196 (internal quotation marks omitted); see also Arizona, 132 S. Ct. at 2501.

Colorado sought from the district court partial summary judgment declaring that the State's authority to enforce its hazardous waste regulation prohibiting the storage of any hazardous waste restricted from land disposal, 6 Colo. Code Regs. § 268.50§ 268.50, against the United States with regard to its storage of chemical weapons at the Depot. But the United States cannot comply with that State regulation, prohibiting the storage of any such hazardous waste, and also comply with Congress's mandate that it must biotreat and neutralize the Depot's chemical weapons at a plant built at the Depot solely for that purpose. It appears that the Depot has not yet completed constructing the plant. And Congress gave the Depot until December 2017 to destroy the chemical weapons in the plant.[9]

Colorado acknowledges that, in practical terms, the United States cannot immediately eliminate the chemical weapons currently stored at the Depot. The State

_____

[9] Colorado argues, for the first time in its reply brief on appeal, that federal law cannot preempt 6 Colo. Code Regs. § 268.50 because Congress, in enacting 50 U.S.C. § 1521, did not expressly require that the United States store chemical weapons at the Depot. Though we need not address such a belatedly raised argument, see United States v. Bass, 661 F.3d 1299, 1301 n.1 (10th Cir. 2011), Colorado's argument fails in any event. For preemption purposes, Congress's intent need not be explicit; it can "be . . . implicitly contained in [the] structure and purpose" of the relevant statute. Cipollone, 505 U.S. at 516 (internal quotation marks omitted). Here, because Congress prohibited the DOD from moving the Depot's chemical weapons out of Colorado, and because Congress has set the 2017 deadline for the completion of their destruction, Congress has thus implicitly mandated that the DOD continue to store these weapons at the Depot for the time being.

18

nonetheless seeks to exercise its authority to prohibit the storage of any such hazardous waste by requiring the United States to follow a schedule that will ensure the destruction of the chemical weapons by a date certain. And, in an effort to avoid conflict preemption, Colorado selected as its date certain the same date as that currently provided by Congress, December 31, 2017.[10] In addition to seeking to enforce the same deadline chosen by Congress, however, Colorado further seeks to provide interim project milestones that the State can enforce against the United States to insure its compliance with the 2017 deadline.

To avoid conflict preemption, "'it is not enough to say that the ultimate goal of both federal and state law is the same. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal.'" Edmondson, 594 F.3d at 769 (quoting Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987) (alterations, citation omitted)); see also Arizona, 132 S. Ct. at 2505. And that is true here, as well.

Our conclusion, that Colorado cannot enforce its prohibition against the storage of any hazardous waste restricted from land disposal against the United States' storage of chemical weapons at the Depot is founded on the detail Congress has provided regarding

---

[10] Colorado further asserts that, in the exercise of its authority to prohibit the storage of any hazardous waste restricted from land disposal, the State could require the United States to destroy the Depot's chemical weapons earlier than Congress's 2017 deadline, and such a requirement would not be inconsistent with the congressional mandate that the Army destroy these weapons "no later than" December 2017. Further, it appears likely that, if Colorado has authority to regulate the Depot's chemical weapons, it will exercise that regulatory authority to continue to enforce the 2017 deadline even if Congress acts to extend the deadline for the destruction of these weapons.

how and when the DOD must destroy these weapons. While Congress directed the Secretary of Defense to destroy these weapons, Congress also acted to insure that the manner of their destruction "provide[s] for . . . maximum protection for the environment, the general public, and the personnel who are involved in the destruction," and that the destruction occur in "adequate and safe facilities designed solely for the destruction." 50 U.S.C. § 1521(d)(1)(A), (B) (2011). To that end, Congress required testing of incineration as a method of destruction, and later directed the Secretary to explore alternative destruction methods, eventually settling on neutralization of the Depot's weapons. Thus, Congress has required a measured pace in undertaking the destruction of these chemical weapons and, on at least six occasions, has extended the destruction deadline to accommodate that pace. This unmistakably indicates that Congress intended to reserve for itself the power and flexibility to establish and extend the destruction deadline, as well as to alter the process and timing by which these chemical weapons are destroyed. Moreover, Congress's comprehensive treatment of the destruction of these weapons indicates that the timing of the weapons' destruction is but one of several congressional goals addressed in Title 50. Permitting Colorado to be a second enforcer of the 2017 destruction deadline, and to add other enforceable interim deadlines of its own, interferes with the measured, flexible and frequently revised approach Congress has taken to destroy these weapons.

Our conclusion, that Colorado cannot enforce its prohibition against the storage of any hazardous waste restricted from land disposal against the United States' storage of chemical weapons at the Depot, is bolstered by the Supreme Court's recent decision in

20

Arizona v. United States, 132 S. Ct. 2505., (noting that, although Arizona's law at issue in that case "attempts to achieve one of the same goals as federal law . . . , it involves a conflict in the method of enforcement. The Court has recognized that a conflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy") (quotation marks, alterations omitted).

Understandably, Colorado has grown impatient with the delay in destroying the chemical weapons stored at the Depot. But compelling the United States, in its handling of these munitions, to comply with Colorado's regulation prohibiting the storage of any hazardous waste restricted from land disposal will impede or interfere with the accomplishment of the objectives and purposes of 50 U.S.C. §§ 1512a and 1521. Therefore, 50 U.S.C. §§ 1512a and 1521 preempt Colorado's enforcement of its regulation, 6 Colo. Code Regs. 268.50, against the United States under the circumstances presented here. See Arizona, 132 S. Ct. at 2505, 2507 (holding state law that interfered with, or presented an obstacle to, the accomplishment of Congress's objectives was preempted under a theory of conflict preemption).

Our earlier case of United States v. Colorado, 990 F.2d 1565 (10th Cir. 1993), on which the State relies, does not require a different conclusion. In that case, we held that Colorado could enforce its hazardous waste regulations, authorized by RCRA, "at a hazardous waste treatment, storage and disposal facility owned and operated by the federal government which the EPA ha[d] placed on the national [Superfund] priority list, and where a CERCLA [Comprehensive Environmental Response, Compensation, and Liability Act of 1980] response action [wa]s underway." Colorado at 1568-69, 1584.

21

But Colorado was able to do so there because of two savings clauses that Congress included in CERCLA:

> CERCLA's "savings provision" provides that "[n]othing in [CERCLA] shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants,'" 42 U.S.C. § 9652(d) (West 1983). Similarly, CERCLA's provision entitled "relationship to other laws" provides that "[n]othing in [CERCLA] shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614(a) (West 1983).

Id. at 1575-76 (footnote omitted; brackets in original).

RCRA, too, similarly provides that "[n]othing in this chapter [referring to RCRA, 42 U.S.C. §§ 6901-6992k] shall be construed to prohibit any State or political subdivision thereof from imposing any requirements, including those for site selection, which are more stringent that those imposed by [federal] regulations." 42 U.S.C. § 6929. But it is not RCRA that preempts Colorado's enforcement of its storage prohibition on the United States' storage of chemical weapons at the Depot. Instead, it is 50 U.S.C. §§ 1512a and 1521 that preempt Colorado's enforcement of its storage prohibition under the circumstances presented here. And those federal statutes do not include any savings language.

On appeal, Colorado seeks to avoid preemption by asserting it only wants to exercise its regulatory authority under its regulation prohibiting the storage of any hazardous waste restricted from land disposal in order to enforce Congress's own 2017 deadline for the destruction of these chemical weapons. But Colorado can only enforce that, or any other, deadline against the Depot if Colorado has authority to regulate the

22

Depot's stored chemical weapons in the first place. That is why Colorado sought partial summary judgment specifically to that effect. But we conclude, for the reasons stated above, that 50 U.S.C. §§ 1521 and 1512(a) preempt Colorado's authority to regulate the Depot's chemical weapons under the circumstances presented here. So it does not matter that Colorado only seeks to exercise its regulatory authority in a limited manner. Cf. Farina v. Nokia Inc., 625 F.3d 97, 133 (3d Cir. 2010), cert. denied, 132 S. Ct. 365 (2011) ("For the purposes of preemption analysis, it is the cause of action, and not the specific relief requested, that matters.").

## IV.  CONCLUSION

For the foregoing reasons, we conclude that 50 U.S.C. §§ 1512a and 1521 preempt Colorado's application of its prohibition against the storage of any hazardous waste restricted from land disposal against the United States' storage of chemical weapons at the Depot. Therefore, we AFFIRM the district court's decision to dismiss Colorado's claims as preempted by federal law.