FILED
United States Court of Appeals
Tenth Circuit

February 21, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

DARYL J. HUDSON, III,

       Defendant - Appellant.

No. 13-2070
(D.C. No. 1:12-CR-01250-JAP-1)
(D. N. Mex.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **ANDERSON**, and **MATHESON**, Circuit Judges.

Daryl J. Hudson appeals his convictions and the sentence imposed on seven

counts of wire fraud in violation of 18 U.S.C. § 1343.  Mr. Hudson argues the district

court (1) abused its discretion in admitting other acts evidence under Fed. R. Evid.

404(b) at his jury trial; (2) erred in awarding restitution to victims not named in the

indictment; and (3) erred in failing to state its reasons for rejecting his request for a

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

downward departure at sentencing. Exercising jurisdiction under 28 U.S.C. § 1291

and 18 U.S.C. § 3742(a), we affirm.

## I. **INDICTMENT, TRIAL, AND CONVICTION**

Because the litigation in the district court on the Rule 404(b) issue focused on

the similarity between the Government's proposed evidence and the offense charged,

we begin with a summary of the indictment,[1] which charged as follows:

Mr. Hudson "designed and executed a scheme and artifice to defraud"

Bluenergy Solarwind, Inc. ("BSI") and its president, Joel Goldblatt, "by falsely

representing his ready access to reliable sources of debt funding for BSI." Aplt.

App., Vol. 1 at 18. In early 2011, Mr. Goldblatt "began actively seeking

approximately $80 million in debt funding in order to allow BSI to begin

manufacturing certain new solar wind turbines for subsequent sale." *Id.* A third

party referred Mr. Goldblatt to Mr. Hudson "as someone who might be able to locate

the type of funding BSI needed." *Id*. Mr. Goldblatt contacted Mr. Hudson to discuss

engaging Mr. Hudson's company, Hampden Kent Group, LLC ("HKG"), to locate

and place the debt funding that BSI needed. *Id*.

---

[1] The approach we take here—comparing the Rule 404(b) evidence to the charged offense—is common in our case law. For example, in *United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000), we explained: "This court has . . . recognized the probative value of uncharged acts to show motive, intent, and knowledge, whether the acts involved previous conduct or conduct subsequent to the charged offense, as long as the uncharged acts are similar to the charged crime and sufficiently close in time."

Mr. Hudson provided background materials to Mr. Goldblatt, including an HKG client brochure containing "descriptions of various structured and corporate finance transactions supposedly undertaken by HKG between 1992 and 2010." *Id.* at 19. Mr. Hudson told Mr. Goldblatt "that if BSI were to hire HKG, at that time HKG would provide BSI with a 'loan commitment'" and "that HKG would 'attach to the loan commitment, to show good faith, some treasuries on deposit with the New York Federal Reserve Bank.'" *Id.*

Mr. Hudson recommended against Mr. Goldblatt's trying to close a loan with the investor who owned these treasuries, indicating that he had a strong relationship and a good closing history with another investor he would prefer to deal with. *Id.* Mr. Hudson explained to Mr. Goldblatt that the loan commitment would represent a "'clear cut commitment'" and "that BSI could use this loan commitment to help obtain customer orders and equity funding and that the loan commitment would be provided 'to assist [Mr. Goldblatt] in triggering the process.'" *Id.* at 20.

Mr. Hudson provided Mr. Goldblatt with a draft Services Agreement, under which BSI would pay HKG a retainer fee of $300,000, with half of the fee due upfront and the remaining half due upon signing an agreement to receive the $80 million in funding. *Id*. at 19-20. In exchange for this fee, "HKG agreed to 'use its best efforts to obtain finance in accordance with [BSI]'s financial and operational objectives.'" *Id*. at 20. The Services Agreement also contained a clause requiring the parties to arbitrate any disputes. *Id*.

After Mr. Hudson agreed that BSI could pay its upfront $150,000 retainer fee in installments, BSI wired HKG a partial payment. *Id*. at 20-21. The parties then executed the Services Agreement on July 21, 2011. *Id*. at 21. The next day, Mr. Hudson emailed Mr. Goldblatt a copy of a document titled "Loan Commitment." *Id*. That document stated:

> We are including herewith a copy [of] our investor source's safe keeping receipt from the Federal Reserve Bank of New York, verifying a deposit of US Treasuries in denominations of $500 million. The receipt term expires in 2015. We include this to make a good faith showing of our ability to perform.

*Id*.

Mr. Hudson said he would provide the referenced document once BSI paid the remainder of the first installment of the upfront retainer fee. *Id*. Later, on July 22, after Mr. Hudson had received an additional payment from BSI, he "sent an email to [Mr. Goldblatt] attaching a photocopy of a document entitled 'Safekeeping Receipt' ("SKR")," which purported to be issued on Federal Reserve Bank of New York letterhead. *Id.* The SKR appeared to represent that a valued client had U.S. Treasury checks in denominations of $500 million on deposit with that bank, but it was "a false and fraudulent document." *Id.* at 22.

Over the next few months, Mr. Goldblatt attempted to obtain the letters of intent from prospective BSI customers that Mr. Hudson said were "necessary in order to conduct an appropriate credit evaluation in anticipation of presenting the funding request to HKG's preferred funding source." *Id.* Mr. Hudson "expressed mounting

frustration" with Mr. Goldblatt's failure to provide these letters, and Mr. Goldblatt indicated his discomfort with the progress of the deal and Mr. Hudson's way of conducting business. *Id.* at 23.

"Ultimately, in keeping with the design of [Mr. Hudson's] scheme and artifice, the business relationship between BSI and HKG deteriorated." *Id.* Mr. Goldblatt informed Mr. Hudson by phone on August 11, 2011, that BSI could no longer go forward with HKG. *Id.* Mr. Goldblatt asked Mr. Hudson to return $60,000 of BSI's retainer fee. *Id.* Mr. Hudson refused that request and hung up. *Id.* That same day, Mr. Goldblatt's attorney sent Mr. Hudson a letter (1) stating that the Federal Reserve Bank had confirmed that the SKR was a false and fraudulent document and (2) seeking return of the full retainer fee paid by BSI. HKG did not respond to the allegation that the SKR was fraudulent. *Id.* Instead, HKG's attorney wrote a letter to BSI's attorney alleging BSI had breached the Services Agreement, including by misusing the SKR. *Id.* The letter demanded arbitration and sought $965,000 in damages from BSI. *Id.*

\* \* \* \*

The indictment charged that Mr. Hudson had committed wire fraud in connection with seven telephone, email, or facsimile communications to Mr. Goldblatt or BSI's attorney that related to the Loan Commitment and/or the SKR. A jury convicted Mr. Hudson on all seven counts of wire fraud.

## II. **DISCUSSION**

### A. *Rule 404(b) Evidence*

### 1. **Legal Background and Scope of Review**

Mr. Hudson argues that the district court abused its discretion by admitting certain evidence under Fed. R. Evid. 404(b). That Rule provides:

(b) Crimes, Wrongs, or Other Acts.

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

District courts consider four factors in deciding whether to admit evidence under Rule 404(b): "(1) whether the evidence is offered for a proper purpose, (2) its relevancy, (3) that the probative value of the evidence is not substantially outweighed by its prejudicial effect, and (4) a limiting instruction is given if the defendant so requests." *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006). *See Huddleston v. United States*, 485 U.S. 681 (1988). If the uncharged acts are offered for a permissible purpose, they are admissible "as long as [they] are similar to the charged crime and sufficiently close in time." *Mares*, 441 F.3d at 1157 (internal quotation mark omitted). Although the other acts must be similar, they "need not be identical." *Id.*

"We review the district court's admission of evidence under [Rule] 404(b) for abuse of discretion." *Id.* at 1156. "We will not reverse a district court's ruling if it falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious or whimsical." *Id.* (internal quotation marks and brackets omitted).

## 2. **Government's Proffer**

Before trial, the Government served notice of its intent to introduce evidence of similar transactions that Mr. Hudson had engaged in before and after his dealings with Mr. Goldblatt and BSI.[2] In making this proffer, the Government characterized Mr. Hudson's mode of doing business as an "advance fee scheme" and argued that "the linchpin of [Mr. Hudson's] fraud scheme was his ability to self-promote, and to maintain and advance his image as an accomplished and reputable financier." Aplee. Supp. App., Vol. I at 19, 21.

The Government's proffered evidence consisted of testimony by four individuals whose companies, like BSI, had signed agreements with Mr. Hudson and paid retainer fees in return for his services in obtaining debt financing for various business projects. The Government contended that the evidence was similar to the charged conduct: (1) the witnesses entered into agreements with Mr. Hudson for him to locate debt funding; (2) Mr. Hudson received substantial retainer fees in return for

---

[2] The Government argued alternatively that some of this evidence was intrinsic to the charges against Mr. Hudson. The district court, however, admitted the evidence only under Rule 404(b).

his promises to obtain such funding; (3) he failed to locate any funding; (4) Mr. Hudson blamed the clients for the failure of the transactions; and (5) he threatened legal action against the clients.

The Government argued this testimony was relevant to Mr. Hudson's intent to defraud, his plan, and an absence of mistake or accident. More specifically, the Government asserted this evidence would be relevant to disproving Mr. Hudson's anticipated defense that his interactions with Mr. Goldblatt were nothing more than a failed business deal. Although the Government conceded that some good faith transactions may legitimately conclude in a failure to obtain funding, the loss of a client's retainer fee, and the prospect of litigation, it argued that a factfinder could conclude that the similar attributes of these five such transactions supported an inference of fraud.

### 3. **District Court's Ruling**

The district court held that the proffered testimony regarding Mr. Hudson's other transactions was admissible under Rule 404(b). It concluded that the evidence was offered for the proper purposes of proving Mr. Hudson's fraudulent intent or absence of mistake and was relevant because the other transactions occurred closely in time and were similar to what happened between Mr. Hudson and Mr. Goldblatt. The court also decided that the testimony's probative value was not outweighed by the potential for unfair prejudice because the jury could conclude, as Mr. Hudson contended, that the evidence showed only several failed business transactions.

Finally, the court instructed the jury regarding the proper, limited purpose for the evidence.

### 4. **Analysis**

Mr. Hudson argues the district court abused its discretion because the uncharged acts were not sufficiently similar to the charges in the indictment. He emphasizes that all of the wire fraud charges in this case involved the SKR, and he maintains that, to be admissible under Rule 404(b), the uncharged acts must also have involved an SKR. With an SKR missing from the other transactions, Mr. Hudson contends that the evidence failed to satisfy the second Rule 404(b) factor: relevance.[3] *See United States v. Becker*, 230 F.3d 1224, 1232-33 (10th Cir. 2000) (holding that district court abused its discretion by admitting prior acts relating to methamphetamine possession and trafficking to prove a common scheme of manufacturing the drug).

We disagree. *Becker* is distinguishable. We concluded there that prior acts involving only *possession* and *trafficking* of methamphetamine were not—without further factual development—relevant to proving the defendant's motive or intent regarding charges related to *manufacturing* that drug. *Id.* at 1232-33. Here, under the wire fraud statute, the Government was required to prove that Mr. Hudson had

---

[3] We note Mr. Hudson does not identify where he made this precise argument about the SKR in the district court, and our review of the record has not found that he did so. We nonetheless address the contention as a more specific version of the relevancy argument he did advance. The Government does not argue this issue is reviewable only for plain error.

"devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343; *see also* Aplt. App., Vol. V at 1406 (jury instruction on elements of the charged offenses).

The indictment alleged Mr. Hudson designed and executed a scheme and artifice to defraud BSI and Mr. Goldblatt by falsely representing ready access to reliable sources of debt funding for BSI. The proffered Rule 404(b) testimony to prove Mr. Hudson's intent to defraud related to other transactions in which he allegedly pursued a similar scheme. Each witness's proposed testimony concerned Mr. Hudson's alleged false or fraudulent pretenses, representations, or promises in connection with one of these other transactions.[4] The absence of an SKR in the other transactions does not diminish the relevance of the evidence to prove Mr. Hudson's intent to defraud.

The facts of this case are closer to decisions in which we affirmed the admission of other acts evidence under Rule 404(b). *See, e.g.*, *United States v. Grissom*, 44 F.3d 1507, 1509, 1513 (10th Cir. 1995) (in prosecution for false statements to a bank, district court did not abuse its discretion by admitting evidence of defendant's unrelated falsification of union payroll records to show defendant's

---

[4] Mr. Hudson attempted to controvert this evidence, but its relevance does not depend on its being uncontroverted. Mr. Hudson does not argue that the jury could not reasonably conclude that the other acts occurred and that Mr. Hudson was the actor. *See United States v. Reddeck*, 22 F.3d 1504, 1509 (10th Cir. 1994).

intent, knowledge, and lack of mistake); *United States v. Bolt*, 776 F.2d 1463, 1464, 1470-71 (10th Cir. 1985) (in prosecution for material false statements to a bank and mail fraud, district court did not abuse its discretion by admitting evidence of the general fraudulent nature of defendant's business as relevant to defendant's identity, existence of a scheme to defraud, intent, and absence of mistake); *United States v. Bonnett*, 877 F.2d 1450, 1452, 1460-61 (10th Cir. 1989) (in bank fraud prosecution involving one bank, district court did not abuse its discretion by admitting evidence of defendant's accounts with insufficient funds at a different bank, which tended to show intent, motive, and knowledge with respect to defendant's fraudulent scheme); *United States v. Parnell*, 581 F.2d 1374, 1378 (10th Cir. 1978) (in prosecution related to scheme involving forged cashier's checks, district court did not abuse its discretion in admitting evidence of defendant's previous check scheme which tended to show defendant's knowledge and absence of mistake).

We cannot say the district court's decision to admit the Rule 404(b) evidence fell outside "the bounds of permissible choice in the circumstances," or was "arbitrary, capricious or whimsical." *Mares*, 441 F.3d at 1156 (internal quotation marks omitted). Accordingly, Mr. Hudson has not shown that the district court abused its discretion.

### B. *Scope of Restitution Order*

Mr. Hudson next argues the district court misconstrued the Mandatory Victim Restitution Act ("MVRA") by ordering him to make restitution to victims other than

Mr. Goldblatt and BSI, namely the victims of the other transactions described in the Rule 404(b) testimony. The MVRA directs the district court to order the defendant to "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). Mr. Hudson emphasizes that the Rule 404(b) witnesses were not named as victims in the indictment. But "victim" in the MVRA is defined more broadly as

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, *in the case of an offense that involves as an element a scheme . . ., any person directly harmed by the defendant's criminal conduct in the course of the scheme*.

*Id.* § 3663A(a)(2) (emphasis added). Although Mr. Hudson acknowledges that the wire fraud statute includes a scheme to defraud as one of its elements, he contends that the Rule 404(b) witnesses are not "victims" under the MVRA because none of their losses occurred as a result of his conduct in the course of the particular scheme alleged in the indictment.

Mr. Hudson concedes he did not raise this objection in the district court, and we therefore review his claim only for plain error. *See United States v. Shengyang Zhou*, 717 F.3d 1139, 1152 (10th Cir. 2013). "To establish plain legal error, Mr. [Hudson] must show [1] an error, [2] clear and obvious under current law, [3] that affects substantial rights." *Id.* at 1154. He must identify a "particularly egregious or obvious and substantial legal error, which our failure to consider would result in a miscarriage of justice." *Id.* (internal quotation marks omitted).

- 12 -

Because Mr. Hudson does not show an error that is plain, he fails to satisfy the second element. He quotes this court as stating that the MVRA "did not change the general rule that restitution may only be ordered for losses caused by the offense of conviction." Aplt. Opening Br. at 30 (quoting *United States v. Gordon*, 480 F.3d 1205, 1211 (10th Cir. 2007)). But the very next sentence in *Gordon*, which Mr. Hudson ignores, clarifies that "[i]n only two cases does the MVRA authorize restitution to be paid to someone other than the victim . . . of the offense of conviction. The first is where the criminal conduct involves a 'scheme.'" 480 F.3d at 1211 (quoting § 3663A(a)(2)). Moreover, neither *Gordon* nor any case Mr. Hudson cites from other circuits supports his contention regarding the scope of the term "scheme" as used in the MVRA. In each of these cases, the offense of conviction did not involve as an element any "scheme." *See id.*; *United States v. Davenport*, 445 F.3d 366, 373-74 (4th Cir. 2006), *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708 (2008); *United States v. Frith*, 461 F.3d 914, 920 (7th Cir. 2006); *United States v. Newsome*, 322 F.3d 328, 341-42 (4th Cir. 2003). And at least one other court has rejected Mr. Hudson's contention. *See United States v. Edwards*, 728 F.3d 1286, 1293 (11th Cir. 2013) (holding that "when the crime of conviction includes a scheme . . . as an element of the offense, the court may order restitution for acts of related conduct for which the defendant was not convicted" (internal quotation marks omitted)). Mr. Hudson has not identified an error that "is clear or obvious under current law." *Shengyang Zhou*, 717 F.3d at 1156 (internal

- 13 -

quotation marks omitted).  We therefore affirm the district court's restitution order.
*See id.*

C. ***District Court's Alleged Failure to Explain Denial of Downward Departure***

In his final contention, Mr. Hudson alleges the district court failed to explain why it denied his request for a downward departure at sentencing.  He had sought a sentence below his applicable range under the advisory Sentencing Guidelines to care for his son, who has special health needs.  At the sentencing hearing, Mr. Hudson noted his objection to the Presentence Report's ("PSR") conclusion that a downward departure was unwarranted.

The district court calculated the applicable Guidelines range, finding a lower offense level than that recommended in the PSR.  The court then concluded, without objection from Mr. Hudson, that the applicable Guidelines range was 70 to 87 months of imprisonment.  After stating that a sentence of 70 months—the bottom of the Guidelines range—was appropriate, the court discussed each of the sentencing factors in 18 U.S.C. § 3553(a).

Before the hearing concluded, the Government asked the district court to confirm that it had found no basis for a departure or a variance.  The court responded, "That is correct.  I have chose[n] not to depart, obviously, and I chose not to vary downward from the guideline range."  Aplt. App., Vol. V at 1667.  Mr. Hudson is correct that, in explaining the bases for his sentence, the district court did not state any reason for denying his request for a downward departure.

- 14 -

The Government argues that we lack jurisdiction to consider Mr. Hudson's claim. It maintains that we may review a sentencing court's discretionary decision not to depart downward from the Guidelines range only if the court unambiguously stated that it lacked any discretion to do so. *See United States v. Sierra-Castillo*, 405 F.3d 932, 936 (10th Cir. 2005).

But Mr. Hudson is not asking this court to review the district court's discretionary decision. Rather, he contends the district court failed to follow the proper procedure in imposing his sentence. *See United States v. Martinez*, 512 F.3d 1268, 1275 (10th Cir. 2008). In the sentencing context, procedural error includes the district court's "fail[ure] to adequately explain the chosen sentence." *Id.*; *see also* 18 U.S.C. § 3553(c) (requiring court to "state in open court the reasons for its imposition of the particular sentence"). The Government cites no case holding that we lack jurisdiction to review Mr. Hudson's procedural reasonableness claim.

The Government is correct, however, that Mr. Hudson did not raise this claim in the district court. After the court stated that it had chosen not to depart, Mr. Hudson failed to object that the court's explanation of his sentence was not adequate. We therefore review his claim only for plain error. *See United States v. Romero*, 491 F.3d 1173, 1175, 1178 (10th Cir. 2007). Mr. Hudson fails to show any error, much less plain error.

If the district court imposes a sentence within the Guidelines range, it need not provide more than "a general statement noting the appropriate guideline range and

how it was calculated." *United States v. Cereceres-Zavala*, 499 F.3d 1211, 1217 (10th Cir. 2007) (quotations omitted). The defendant in *Cereceres-Zavala* raised the same contention that Mr. Hudson makes here. *See id.* at 1213. We held that "[a]lthough the sentencing court provided no direct response at all to [the defendant's] requests for departure, its citation of the PSR's calculation method and recitation of the suggested imprisonment range amply fulfilled § 3553(c)'s requirement." *Id.* at 1217. We concluded that "the court must have believed there was not much more to say." *Id.* (internal quotation marks omitted). Similarly, in *United States v. Jarrillo-Luna*, we rejected the defendant's contention "that a district court must address each and every argument for leniency that it rejects in arriving at a reasonable sentence." 478 F.3d 1226, 1229 (10th Cir. 2007), *overruled on other grounds by United States v. Lopez-Macias*, 661 F.3d 485 (10th Cir. 2011). Rather, "a district court's duty to explain why it chose the given sentence does not also require it to explain why it decided against a different sentence." *Id.* at 1230.

Mr. Hudson does not show that the district court erred by "fail[ing] to go further and explain why it found [his] . . . arguments for leniency unpersuasive." *Id.* Moreover, even if he had shown plain error, he makes no attempt to argue that the court's failure to state its reasons for denying a downward departure affected his substantial rights. *See Romero*, 491 F.3d at 1179. His procedural reasonableness claim therefore fails.

## III. **CONCLUSION**

The judgment of the district court is affirmed.

ENTERED FOR THE COURT,


Scott M. Matheson, Jr.
Circuit Judge