FILED
United States Court of Appeals
Tenth Circuit

June 10, 2013

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 11-1261

SHENGYANG ZHOU a/k/a TOM,

Defendant-Appellant.

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:10-CR-00226-PAB-1)**

Jessica E. Yates of Snell & Wilmer L.L.P., Denver, Colorado, for Defendant-Appellant.

James C. Murphy, Assistant U.S. Attorney (John F. Walsh, United States Attorney, with him on the brief), Denver, Colorado, for Plaintiff-Appellee.

Before **KELLY**, **SEYMOUR**, and **TYMKOVICH**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Mr. Shengyang Zhou pled guilty to trafficking and attempted trafficking of counterfeit goods in violation of 18 U.S.C. § 2320 and § 2. He was sentenced to eighty-seven months' imprisonment and three years' supervised release, and he was ordered to pay restitution of $507,567. Mr. Zhou contends the district court made a number of errors in sentencing him. We disagree and affirm.

## I.

Mr. Zhou's plea agreement set forth a lengthy statement of facts which the parties agreed the government's evidence would establish. The following facts are taken from the plea agreement or from undisputed portions of the presentence report, which the district court adopted. *See* FED. R. CRIM. P. 32(i)(3) ("At sentencing, the court: (A) may accept any undisputed portion of the presentence report as a finding of fact. . . .").

Between December 2008 and March 2009, the Food and Drug Administration (FDA) issued a series of nationwide broadcast alerts on its website advising the public that the agency had identified over seventy-two purported weight loss products containing undeclared active pharmaceutical ingredients (APIs) that could put consumers' health at risk. One of the undeclared APIs was Sibutramine, a Schedule IV non-narcotic controlled substance that was at the time approved by the FDA only for the treatment of obesity in a patented drug commonly known as "Meridia." The alerts stated that the listed products posed serious health risks and advised consumers to immediately stop taking them and

to consult a medical professional.

Starting in January 2010, the FDA issued a separate series of broadcast alerts on its website regarding the marketing and sales of counterfeit versions of a weight loss product known by its brand name, "Alli," which had also been found to contain dangerous levels of Sibutramine. The genuine product is manufactured by the pharmaceutical company Glaxo Smith Kline (GSK) and contains Orlistat as its API, not Sibutramine, and is approved by the FDA for over-the-counter sales. The alerts indicated that the counterfeit Alli was typically being sold to consumers on internet auction websites and looked similar to the authentic Alli weight loss drug, including the Alli name and trademarks, but contained certain enumerated defects. The alerts further warned that consumers who took counterfeit versions of the drug in accordance with the GSK dosing directions for genuine Alli could be ingesting up to twice the recommended maximum dosage for Sibutramine, resulting in a myriad of health risks.

During all periods relevant to this case, the name "Alli" and certain stylized versions of that name were trademarks registered by GSK on the principal register of the United States Patent and Trademark Office. GSK used these registered trademarks on the labels affixed to the bottles in which the Alli capsules were contained, on the associated boxes and related packaging, and on patient literature enclosed with the product.

The investigation of Mr. Zhou was initiated by federal agents from the FDA

Office of Criminal Investigations (OCI), Immigration and Customs Enforcement (ICE), and the Postal Inspection Service after a controlled delivery in April 2009 to a Broomfield, Colorado resident identified as J.K. The parcel contained hundreds of boxes of "Super Slim" and "Meizitang," two of the purported weight loss products listed in the FDA alerts as containing undeclared APIs. J.K. advised the agents that he operated an internet-based business selling these purported weight loss products to consumers throughout the United States. He informed the agents that one of his suppliers was a Chinese national ultimately identified by the agents as Mr. Zhou. J.K. told the agents that he had previously purchased from Mr. Zhou commercial quantities of these products, as well as "2 Day Diet," another product listed in the FDA alerts. He admitted that he had continued to purchase these products after learning about the FDA warnings and corresponding with Mr. Zhou about the alerts.

Starting in August 2009, an FDA-OCI undercover agent began contacting Mr. Zhou through email, first portraying himself as J.K. and then also as J.K.'s business partner. In November 2009, the undercover agent placed an order with Mr. Zhou for 500 boxes of Super Slim. Mr. Zhou filled this order during late November and early December by causing six parcels to be mailed from various addresses in China to an undercover address in Littleton, Colorado. The parcels contained more than 18,000 capsules of Super Slim in blister packs, samples of which were determined in FDA laboratory testing to contain Sibutramine. In

-4-

exchange, agents paid Mr. Zhou $2,500 via two Western Union payments sent to an individual in China later identified by Mr. Zhou as his girlfriend.

In January 2010, the undercover FDA-OCI agent, acting as J.K.'s business partner, placed a second order with Mr. Zhou for 200 boxes of Super Slim and 100 boxes each of Meizitang and 2 Day Diet. In addition, having learned that Mr. Zhou also sold commercial quantities of purported Alli, the agent requested fifty boxes of Alli. Mr. Zhou fulfilled this order, causing five parcels containing the requested quantities of the drugs and accompanying packaging and leaflets to be mailed from China to the undercover address in Littleton, Colorado. Tested samples from these parcels were determined to contain Sibutramine.

One of these five parcels contained approximately 6,000 capsules of purported Alli, along with fifty folded boxes, bottles, and consumer product literature bearing the registered trademarks and other markings of the authentic Alli product (each bottle and corresponding box were to contain 120 capsules). On close inspection, the capsules, bottles, and related packaging and literature were found to share the same defects and errors detected in the counterfeit Alli products that were the subject of the FDA warnings. The agents paid Mr. Zhou $4,000 for these shipments via Western Union wire transfers to Mr. Zhou's girlfriend in China.

In February 2010, Mr. Zhou agreed to meet with the FDA-OCI undercover agent in Bangkok, Thailand for the ostensible purpose of negotiating future sales

of larger volumes of counterfeit weight loss products, as well as to introduce Mr. Zhou to a second undercover agent, a Postal Inspector, posing as the owner of a chain of grocery and health food stores in the United States. During the meetings, which were video and audio recorded, Mr. Zhou portrayed himself as the manufacturer and supplier of the counterfeit weight loss products and acknowledged that they contained Sibutramine and were the subject of FDA alerts in the United States. He told the agents that he sold commercial quantities of these products to various re-distributors in the United States, including in Colorado and Pennsylvania. Mr. Zhou and the agents discussed the various defects in his last batch of counterfeit Alli, and Mr. Zhou promised to correct these problems in the next batch of 10,000 boxes he planned to manufacture.

The undercover agents indicated they were interested in purchasing larger volumes of counterfeit Alli but wanted Mr. Zhou to send it as air cargo with the help of a collusive private customs broker, actually another undercover FDA-OCI agent, who would assist in the plot. At the meeting in Bangkok, the undercover agents placed an order for 100 boxes each of 2 Day Diet and Super Slim to be shipped through the mail, as well as 1,000 boxes of counterfeit Alli to be shipped as air cargo. The agents paid Mr. Zhou $5,500 as half payment for the order.

Following the meeting in Bangkok, the FDA-OCI undercover agent posing as J.K.'s associate exchanged several emails with Mr. Zhou regarding the progress of this third order. In early March 2010, a parcel containing

-6-

approximately 2,994 capsules of Super Slim, along with 100 boxes and related materials, was received at the Littleton, Colorado undercover address from co-defendant Ms. Qingming Hu, Mr. Zhou's Houston, Texas-based redistributor. The following day, a second parcel was received from China containing the order of 2 Day Diet and associated packaging materials. Samples from each of these parcels were found to contain Sibutramine.

In an email sent March 2, 2010, Mr. Zhou asked the undercover agents to consider increasing their order of counterfeit Alli to cover his entire batch of 10,000 boxes, containing a total of 1.2 million capsules. The agents agreed to do so but they wanted additional assurances the defects in the boxes, bottle labels, and customer pamphlets noted in the previous batch of counterfeit Alli had been corrected. Mr. Zhou agreed to send the agents samples of the new batch and also to show the agents samples at a meeting in Honolulu, Hawaii later that month.

Thereafter, Mr. Zhou mailed from Kunming, China to Littleton, Colorado a parcel containing five sets of purported Alli boxes, the accompanying customer product pamphlets, and a sheet of bottle labels. The items bore GSK's registered trademarks for the Alli product and were devoid of the defects and mistakes present in the previous batch of counterfeit Alli.

On March 23, 2010, Mr. Zhou arrived in Honolulu and was met at the airport by the undercover FDA-OCI agent posing as J.K.'s associate and the Postal Inspector posing as the grocery and natural food stores owner. They went

to a hotel where they met with a second undercover FDA-OCI agent, portraying himself as the collusive private customs broker. The meeting was video and audio recorded. Mr. Zhou told the agents that the boxes, bottle labels, and customer product pamphlets had been completed for the 10,000 counterfeit boxes of Alli the agents had ordered, and were in his control, but that he was still awaiting the fabrication of the counterfeit capsules themselves. As proof of his progress, he showed the agents a video clip that showed Mr. Zhou in an apartment, presumably in China, filled with stacks of large packages in plain brown wrappers. In the video, Mr. Zhou opened several of the packages, which contained folded Alli boxes, sheets of bottle labels, and product pamphlets, all displaying the GSK registered Alli trademarks affixed in the appropriate locations.

In addition, Mr. Zhou showed the undercover agents a set of counterfeit boxes, bottle labels, and customer pamphlets he had brought with him to the meeting, noting the defects that had been corrected since his last batch. Mr. Zhou also related to the agents his prior experience manufacturing counterfeit Alli. He told them his first batch had consisted of approximately 2,000 bottles and boxes, most of which had already been sold in the United States and the United Kingdom through his commercial customers. He again acknowledged that the counterfeit Alli, like the other weight loss products he sold, contained Sibutramine and told the agents that the batch he was currently producing would contain even more

Sibutramine.

Mr. Zhou reviewed with the alleged private customs broker the logistics of shipping the 10,000 counterfeit Alli boxes as air cargo. He filled out customs and shipping documents, claiming falsely in the forms that the cargo would be "rice," and providing fictitious contact information for the shipper. Mr. Zhou told the undercover agents that by April 10, eighteen days after the meeting, the order would be complete and ready to ship. As the meeting ended, one of the agents handed Mr. Zhou a stack of U.S. currency which was purportedly part of the $55,000 the agents had promised to pay him that day. Mr. Zhou was arrested after he accepted the money.

During a series of post-arrest interviews, Mr. Zhou told agents that he had, in fact, been planning on completing the 10,000 unit order of counterfeit Alli and shipping the products to the undercover agents. He acknowledged that the contents of the capsules he had been distributing, and had been preparing to again provide, did not contain the same API as genuine Alli but instead contained Sibutramine. Mr. Zhou explained that he outsourced the fabrication of the various components of the products to associates in China. He also acknowledged being aware that the products he manufactured were the subject of FDA alerts and that the sale of these products in the United States violated United States law.

During the course of the investigation of this case, the government identified several people in the United States who had purchased commercial

quantities of Mr. Zhou's products and then redistributed them to consumers. In addition to J.K. in Colorado, the government identified a Pennsylvania resident, referred to herein as W.C., and a Tennessee resident, referred to herein as K.S., as redistributors for Mr. Zhou. Both W.C. and K.S. purchased counterfeit Alli and other weight loss products from Mr. Zhou and resold retail amounts to consumers through internet auctions on eBay and other websites. Federal agents located and interviewed several consumers who had purchased counterfeit Alli through K.S., W.C., and Zhou's other redistributors. Many of these individuals had retained some of the purported Alli capsules, samples of which were tested by the FDA and found to contain Sibutramine. The bottles and accompanying packaging were inspected and, although they bore GSK's registered trademarks, they were found to exhibit the same defects noted in the FDA alerts and presented on the bottles supplied by Mr. Zhou to the undercover agents in January 2010.

Mr. Zhou was charged with fifty-nine counts relating to the trademark infringement, counterfeit production, and trafficking of weight loss drugs, including Alli. In accordance with his plea agreement, he entered a guilty plea as to count 41 of the superseding indictment for trafficking and attempted trafficking of Alli using counterfeit marks registered with the United States Patent and Trademark Office, in violation of 18 U.S.C. § 2320(a)(1) and § 2. As part of his plea agreement, Mr. Zhou agreed that restitution was mandatory and that while he had pled guilty only to count 41 of the superseding indictment, restitution would

be calculated based on the losses sustained as a result of his commission of all offenses charged, including relevant conduct. Mr. Zhou reserved the right to assert any arguments regarding the calculation of his sentencing guideline range that were factually consistent with the terms of his guilty plea.

The pre-sentence report (PSR) calculated Mr. Zhou's base offense level under U.S.S.G. § 2B5.3(a) to be eight. The PSR recommended several increases based on specific offense characteristics: a fourteen-point increase pursuant to § 2B1.1 for the infringement amount, which the government calculated to be $661,292; a two-point increase pursuant to § 2B5.3(b)(3)(A) reflecting the manufacture and importation of the infringing items; a further two-point increase pursuant to § 2B5.3(b)(5)(A) because the offense involved the conscious or reckless risk of death or serious bodily injury; and a four-point increase pursuant to § 3B1.1(a) because Mr. Zhou was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. Finally, the PSR recommended a three-point downward adjustment for acceptance of responsibility, resulting in a total recommended offense level of twenty-seven. Having no criminal history in the United States, Mr. Zhou's criminal history category was I. Under the sentencing guidelines, an offense level twenty-seven combined with a category I criminal history provides for an advisory guideline range of seventy to eighty-seven months' imprisonment. Mr. Zhou objected to the recommended enhancements for the infringement amount calculated in the

PSR, the four-level enhancement for being a leader or organizer, the two-point enhancement for consciousness of a risk of death or serious bodily injury, and the amount of restitution ordered.

At sentencing, the district court found the recommended enhancements in the PSR appropriate and concluded that a sentence at the top of the advisory guideline range was justified, sentencing Mr. Zhou to eighty-seven months' imprisonment and three years' supervised release. The court also ordered Mr. Zhou to pay a total of $507,568.39 in restitution to the victims. Of that amount, $417,396.39 was to be paid to GSK and $90,172 to five individuals who had consumed the counterfeit products.

## II.

Mr. Zhou raises four issues on appeal. He reiterates his objection to the district court's calculation of the infringement amount, contending the court erred by including the not-yet-completed order of 10,000 bottles of counterfeit Alli without making findings regarding whether the sentencing guidelines provision on attempt, U.S.S.G. § 2X1.1, was satisfied. He contests the four-level enhancement for being an "organizer or leader" under U.S.S.G. § 3B1.1(a), claiming the court failed to articulate the factual basis for this enhancement. He also challenges the district court's application of U.S.S.G. § 2B5.3(b)(5), asserting there was insufficient evidence he was consciously aware of a risk of death or serious bodily injury and arguing the court failed to apply the correct standard of

-12-

"recklessness" in making this determination. Finally, Mr. Zhou contends the district court incorrectly included $385,217 of what he calls "public relations" expenses in the restitution he was ordered to pay GSK, asserting such costs are not compensable under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A. We address each argument in turn.

*A. Infringement Amount*

Mr. Zhou first contends the district court erred in imposing a 14-level enhancement to his offense level by miscalculating the "infringement amount" under U.S.S.G. § 2B5.3(b)(1). The dispute centers on whether the final order of 10,000 units of counterfeit Alli, which had not been delivered to the undercover agents at the time of Mr. Zhou's arrest, should be included in the infringement amount. In determining that the 10,000 units should be included, the district court relied on Application Note 2(A)(vii) to § 2B5.3, which states:

> A case under 18 U.S.C. § 2318 or § 2320 that involves a counterfeit label, patch, sticker, wrapper, badge, emblem, medallion, charm, box, container, can, case, hangtag, documentation, or packaging of any type or nature (I) that has not been affixed to, or does not enclose or accompany a good or service; and (II) which, had it been so used, would appear to a reasonably informed purchaser to be affixed to, enclosing or accompanying an identifiable, genuine good or service. In such a case, the "infringed item" is the identifiable, genuine good or service.

U.S. SENTENCING GUIDELINE MANUAL § 2B5.3, app. note 2(A)(vii) (2012). The court held this application note squarely applies to the facts at hand because it is undisputed that the counterfeit boxes, booklets, and labels for the 10,000 units

-13-

had already been produced and were in Mr. Zhou's control at the time of his arrest. The court therefore calculated the infringement amount as the average retail price of a genuine unit of Alli (120-count refill pack) at the relevant time, $51, multiplied by the 666 units that had actually been completed and shipped to the United States plus the 10,000 units which Mr. Zhou had agreed to complete and send, for a total of $543,966. Applying the chart at § 2B1.1(b)(1), this amount of more than $400,000 but less than $1 million corresponded to the 14-level increase the court imposed.

Mr. Zhou asserts the court erred in calculating the infringement amount by not taking into account the law of attempt and U.S.S.G. § 2X.1.1, the general guideline for attempt, solicitation and conspiracy. He claims that under § 2X.1.1, in order to include the 10,000 unfinished units in the infringement amount, the district court was required to determine it was "reasonably certain" that Mr. Zhou was about to complete all the acts necessary for successful completion of these units but for the fact that he was arrested.[1] We review legal questions regarding the application of the sentencing guidelines de novo. *United States v. Brown*, 314 F.3d 1216, 1222 (10th Cir. 2003). We review the district court's factual findings

---

[1] Section 2X1.1 provides, in pertinent part, that when a defendant is convicted of an attempt crime, the base offense level of the substantive offense is decreased by 3 levels "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control." U.S. SENTENCING GUIDELINES MANUAL § 2X1.1(b)(1) (2012).

-14-

for clear error, "giving due deference to the district court's application of the guidelines to the facts." *Id.*

According to its title, § 2X1.1 applies to attempts "not covered by a specific offense guideline." § 2X1.1. *See United States v. Martinez*, 342 F.3d 1203, 1205 (10th Cir. 2003) ("[W]here a defendant is convicted of an attempt crime not itself covered by a specific offense guideline, calculation of the defendant's sentence must be pursuant to § 2X1.1."). The obvious corollary to this rule is that when an attempt crime *is* covered by a specific guideline, that guideline applies and § 2X1.1 does not. § 2X1.1(c)(1) ("When an attempt . . . is expressly covered by another offense guideline section, apply that guideline section."). The district court determined that § 2B5.3 Application Note 2(A)(vii) constituted a specific guideline covering attempt in the context of trafficking counterfeit goods and accordingly applied it in lieu of § 2X1.1. *See United States v. Mojica*, 214 F.3d 1169, 1171 (10th Cir. 2000) ("District courts are obliged to follow the explanatory application notes unless they are plainly erroneous, inconsistent with the guidelines, or violative of the Constitution or a federal statute.").

The cases cited by Mr. Zhou to support his argument against this conclusion are not persuasive. Both *United States v. Guerra*, 293 F.3d 1279 (11th Cir. 2002) (prosecution must establish with "reasonable certainty" that infringing items were close to completion), and *United States v. Sung*, 87 F.3d 194 (7th Cir.

-15-

1996) (same), were decided under an earlier version of § 2B5.3 that did not include Application Note (2)(A)(vii). This application note squarely addresses the circumstances here and, as admitted by Mr. Zhou in his opening brief, was added in direct response to *Sung* and similar cases. The district court did not err in relying on the specific offense guideline rather than the general attempt guideline.

Mr. Zhou also contends the district court neglected to make a finding that the completed packaging materials "would appear to a reasonably informed purchaser to be affixed to, enclosing or accompanying an identifiable, genuine good" as required by § 2B5.3, Application Note 2(A)(vii). The record shows otherwise. Undisputed portions of the PSR and Mr. Zhou's plea agreement recount that the completed packaging for the 10,000 units in question bore GSK's registered trademarks for Alli in the same location as the genuine packaging. Samples of this packaging were sent to GSK employees who determined that, while counterfeit, the packaging was identical to or substantially indistinguishable from genuine packaging materials. Mr. Zhou did not object to these portions of the plea agreement or the PSR, the undisputed portions of which were adopted by the court as findings of fact at sentencing. The fact that the counterfeit package was virtually indistinguishable from the authentic items supports the district court's application of Application Note 2(A)(vii).

B. *Mr. Zhou as Organizer or Leader*

Mr. Zhou next argues that the district court failed to articulate a sufficient basis for finding he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," and for imposing the accompanying four-level role enhancement pursuant to U.S.S.G. § 3B1.1(a). We review the district court's factual finding that the defendant acted as a leader or organizer under § 3B1.1 for clear error. *United States v. Snow*, 663 F.3d 1156, 1162 (10th Cir. 2011). "Under this standard, we will not reverse the district court's finding unless, 'on the entire evidence, we are left with the definite and firm conviction that a mistake has been committed.'" *United States v. James*, 592 F.3d 1109, 1113 (10th Cir. 2010) (quoting *United States v. Wilfong*, 475 F.3d 1214, 1218 (10th Cir. 2007)).

The commentary accompanying § 3B1.1 instructs a sentencing court to consider the following factors to distinguish a leadership or organizational role from one of mere management or supervision:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S. SENTENCING GUIDELINES MANUAL § 3B1.1, cmt. n.4 (2012). More than one person can qualify as a leader or organizer of a single criminal association or conspiracy and "a defendant need not lead or organize at least five individuals. . .

. A defendant may be eligible for the leader or organizer enhancement if he leads or organizes even one other participant." *United States v. Damato*, 672 F.3d 832, 847 (10th Cir. 2012) (citing *United States v. Hamilton,* 587 F.3d 1199, 1222 (10th Cir. 2009)).

Contrary to Mr. Zhou's contention, the record supports the district court's conclusion that he was a leader or organizer for purposes of § 3B1.1(a). The PSR recommended this enhancement and Mr. Zhou initially objected. But at the sentencing hearing Mr. Zhou's counsel retreated from his earlier objection, stating that he would leave the matter to the court's discretion in light of Mr. Zhou's own recorded statements entered into evidence.[2] Indeed, the evidence relied on by the

---

[2]    When asked by the district court whether he had any objection to the leader or organizer enhancement under § 3B1.1(a), Mr. Zhou's counsel replied, "I will leave that to the Court's discretion because what [Mr. Zhou] says in the DVD [recording the various meetings between Mr. Zhou and the undercover federal agents], I think he does say that there was certainly more than four people. Obviously, Ms. Hu is one person who we have that the Court is aware of, but the two people that were redistributors I assume the Court is going to say were part of the same thing that I heard, the organizer or organization of Defendant Zhou. So I have nothing more to submit on that. The DVD speaks for itself." Rec., vol. II, at 102-03. After the prosecution offered a detailed description of the evidence they would produce showing Mr. Zhou qualified as a leader or organizer for purposes of § 3B1.1(a), the court asked Mr. Zhou's attorney "do you contest?" to which he answered, "No." *Id.* at 106. The court then clarified that the prosecution "may want to put on those witnesses unless there is no contested facts in terms of those people [whom the prosecution had alleged Mr. Zhou had led or organized]." *Id.* Mr. Zhou's counsel replied "I am well aware of what my client told the government during its 'debriefing' and I would certainly acknowledge the government has sufficient – I should indicate when I filed the objections, I didn't have access to the DVD nor my client. That's why I went out to the joint to go talk to him and it appears what he said we are stuck with. And obviously he says that, and four or more, and the distinction, I mean obviously is a distinction

-18-

district court in coming to this determination was largely undisputed, consisting mainly of Mr. Zhou's own recorded statements from his meeting with the undercover agents in Bangkok, Thailand and from the meeting and subsequent post-arrest interviews with agents in Honolulu, Hawaii. During these encounters, Mr. Zhou told the agents that he owned two companies producing and distributing both the counterfeit Alli and the other weight loss drugs he sold to the undercover agents, that he was "the boss" of this enterprise, and that he had no other partners in the venture. Rec., vol. III at 41. He assured the undercover agents that he had no need to ask permission or seek approval from anyone else involved in the enterprise when he agreed to supply the counterfeit Alli and other weight loss drugs. Even after Mr. Zhou was arrested, he did not attempt to deny or minimize the leadership role he played in the production of the counterfeit drugs. Mr. Zhou explained to the agents in the course of several post-arrest interviews that while he outsourced the fabrication of the various components of the drugs to associates in China, he was solely responsible for the overall manufacture and distribution of the counterfeit products.

At the sentencing hearing, the government offered to call agents to testify to these facts and also to testify that Mr. Zhou claimed to have had approximately twenty employees and that he personally had come up with the idea to produce counterfeit Alli and sell it in the United States. Although in his appeal Mr. Zhou

without meaning." *Id.*

attempts to paint a different picture, the transcript of the sentencing hearing makes sufficiently clear that when the court asked Mr. Zhou if he contested these assertions, his counsel indicated he did not and that he would accept the government's proffer of evidence. *See* n.3, *infra.* The district court did not spend much time discussing this uncontested evidence, but it found that the leader or organizer prong was satisfied, stating that "of course, here we know that [Mr. Zhou] was a leader or organizer of at least one person, namely the co-defendant, Ms. Hu. So in that sense that requirement has been satisfied."[3] Rec., vol. II at 107.

The government also made a proffer that agents would testify to the extensive nature of the criminal activity and the existence of four or more additional people involved in the enterprise. Again, Mr. Zhou's counsel indicated that he would accept the proffer and that it would not be necessary for the government to call witnesses to testify to these allegations. The district court then proceeded to name four individuals in addition to Mr. Zhou who were "underlings at least" and participants in the criminal enterprise. *Id.* at 107-08. The court further found that due to the sophistication and international scope of the criminal enterprise the "otherwise extensive" prong of § 3B1.1(a) was also satisfied.

---

[3]     Uncontested portions of the PSR and the plea agreement establish that Ms. Hu, based in Houston, Texas, was an employee of Mr. Zhou who facilitated the distribution of counterfeit drugs within the United States.

It would have been preferable if the district court had been more thorough in articulating the reasons for the enhancement and in identifying which of the "organizer or leader" factors supported its finding, but the court's findings were specific enough to provide "a clear picture of the reasoning [the court] employed . . . ." *United States v. Pelliere*, 57 F.3d 936, 940 (10th Cir. 1995) (internal quotation marks omitted); *see also United States v. Wacker*, 72 F.3d 1453, 1476 (10th Cir. 1995) (holding district court's factual findings sufficient for a § 3B1.1(a) enhancement even though court did not explicitly discuss which "organizer or leader" factors supported its finding). The court's findings on this matter are supported by substantial uncontested evidence. *See Wacker*, 72 F.3d at 1476. Moreover, given that Mr. Zhou's attorney withdrew his objection to this enhancement, it is understandable that the court did not make more detailed findings on this point.

In sum, we conclude the district court made sufficient "specific findings and advance[d] a factual basis to support [the] enhancement under U.S.S.G. § 3B1.1," *United States v. Ivy*, 83 F.3d 1266, 1292 (10th Cir. 1996) (internal quotation marks omitted), and that the court's finding that Mr. Zhou qualifies as a leader or organizer under § 3B1.1(a) was not clearly erroneous.

*C. Conscious or Reckless Risk of Death or Serious Injury*

Mr. Zhou also challenges the two-level increase applied to his offense level based on the district court's finding that his conduct involved "the conscious or

-21-

reckless risk of death or serious bodily injury" pursuant to U.S.S.G. §

2B5.3(b)(5).[4] Mr. Zhou objected to the recommendation for this enhancement

contained in the PSR and renewed his objection at the sentencing hearing. In this

appeal, Mr. Zhou claims the evidence relied on by the district court does not

support the finding that he was consciously aware of the serious health risks

posed by the counterfeit Alli he was producing. He further asserts the court

misapplied the "recklessness" prong of § 2B5.3(b)(5), arguing that the court

utilized a negligence standard rather than a recklessness standard and therefore

erred as a matter of law. As explained above, we review legal questions

regarding the sentencing guidelines de novo and factual findings for clear error,

"giving due deference to the district court's application of the guidelines to the

facts." *United States v. Doe*, 398 F.3d 1254, 1257 (10th Cir. 2005) (internal

quotation marks omitted).

We have not yet addressed what mental state is required to qualify for the §

2B5.3(b)(5) enhancement. The wording of this enhancement is identical to the

enhancement for theft and fraud offenses in U.S.S.G. § 2B1.1(b)(14), however,

and the commentary background to §2B5.3 notes that "[t]his guideline treats

copyright and trademark violations much like theft and fraud." § 2B5.3 cmt.

---

[4]     Section 2B5.3, Criminal Infringement of Copyright or Trademark, provides, in relevant part, that "[i]f the offense involved [] the conscious or reckless risk of death or serious bodily injury . . . increase [the offense level] by 2 levels." U.S. SENTENCING GUIDELINES MANUAL § 2B5.3(b)(5) (2012).

-22-

background.  In light of this cross-reference and the identical wording of these two enhancements, we hold that the mens rea requirement of § 2B5.3(b)(5) is the same as the mens rea requirement for § 2B1.1(b)(14).

We examined the mental state required for the theft and fraud enhancement in *United States v. Maestas*, 642 F.3d 1315 (10th Cir. 2011), and held the guideline to "require the defendant to have been conscious of *or* reckless as to the existence of the risk created by his or her conduct."  *Id.* at 1321 (emphasis in original).  We explained:

> Generally, recklessness is an objective standard, and we interpret "reckless risk" to describe objectively culpable conduct.  We hold that a defendant's conduct involves a conscious risk if the defendant was subjectively aware that his or her conduct created a risk of serious bodily injury, and a defendant's conduct involves a reckless risk if the risk of bodily injury would have been obvious to a reasonable person.

*Id.*

The district court applied this enhancement after finding that Mr. Zhou was consciously aware of both the FDA alerts describing the serious health risks posed generally by drugs containing Sibutramine as an undisclosed API, and the warnings specifically addressing the health risks of the counterfeit Alli he was producing and distributing.[5]  In light of the uncontested evidence that Mr. Zhou

---

5  The warnings noted, *inter alia*, that individuals taking counterfeit Alli in accordance with the established dosage instructions may have been taking three times the usual daily dose, which is twice the recommended maximum daily dose.  The warnings explained that such high doses could cause anxiety, nausea, heart palpitations, tachycardia (a racing heart), insomnia and small increases in blood

-23-

discussed these warnings with undercover agents in person in Bangkok and Hawaii, and also via email before those meetings took place, Mr. Zhou's counsel accepted the government's proffer that Mr. Zhou was aware of these warnings during the relevant time period. The court found that Mr. Zhou "had no reason to discount the validity of [the warnings] given the fact that they came from the FDA," and concluded that Mr. Zhou was consciously aware of the risk of death or serious bodily injury from producing and distributing the counterfeit Alli. Rec., vol. II at 116.

The district court's findings are supported by sufficient evidence and are not clearly erroneous. In arguing that he was not consciously aware his conduct created a risk of death or serious bodily injury, Mr. Zhou highlights several comments he made to the undercover agents during their meeting in Bangkok when he assured the undercover agents that he had tested the drugs and no one would die from taking them. He also claimed the FDA issued warnings for any product coming from China. The district court was not persuaded by this argument, noting that Mr. Zhou made these comments as a salesman in the process of selling counterfeit drugs to potential buyers and thus they must "be taken with a grain of salt." *Id.*

It was reasonable and not clear error for the district court to infer that

---

pressure in healthy people. In those with a history of cardiovascular disease, it could lead to elevated blood pressure, stroke, or heart attack.

because Mr. Zhou was aware of the FDA warnings, he was also subjectively and consciously aware of the information contained in the warnings that the counterfeit drugs he was manufacturing and distributing created a risk of death or serious bodily injury. *See Maestas*, 642 F.3d at 1322 (allowing reasonable inference from defendant's history that he had a conscious awareness his conduct involved a risk of death or serious bodily injury). It was therefore appropriate to add the two-level increase to Mr. Zhou's offense level in accordance with § 2B5.3(b)(5).

*D. Restitution*

Mr. Zhou's final argument is that the district court erred in ordering him to pay $417,396.39 in restitution to GSK under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A. We review the legality of a restitution order de novo. *United States v. Quarrell*, 310 F.3d 664 (10th Cir. 2002). "We review the factual findings underlying a restitution order for clear error and the amount of restitution imposed for abuse of discretion." *United States v. Bowling*, 619 F.3d 1175, 1187 (10th Cir. 2010). Where the defendant failed to object, however, we review only for plain error. *United States v. Overholt,* 307 F.3d 1231, 1253 (10th Cir. 2002) (stating plain error standard).

The MVRA mandates, in part, that a district court order a defendant to pay restitution when he is convicted of an offense "in which an identifiable victim . . . has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B)

The statute requires restitution for a number of types of losses. As relevant here, § 3663A(b)(1) mandates restitution "in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense . . . ." In addition, § 3363A(b)(4) provides that a defendant is required to "reimburse the victim for lost income and . . . other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." The only instances in which restitution is not required under the MVRA are if "the number of identifiable victims is so large as to make restitution impracticable," or if "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." §§ 3663A(c)(3)(A), (B).

It is uncontested that the MVRA applies to this case. The district court ordered Mr. Zhou to pay GSK restitution in the amount of $32,179.64 for lost sales, which Mr. Zhou does not challenge, and a further $385,216.75 for expenses incurred by GSK in responding in various ways to the counterfeit Alli, which Mr. Zhou appeals. These sums were based on a letter submitted by GSK to the probation officer and appended to the PSR, which describes the response efforts the company undertook when it learned that counterfeit Alli, produced and distributed by Mr. Zhou, was being sold in the United States. These efforts included: alerting consumers to the dangers posed by, and how to identify, the

-26-

fraudulent drugs; monitoring and tracking consumer reports of the counterfeit product; and retaining the services of a public relations firm to assist with this crisis management. The public relations campaigns focused on providing consumers with "complete and accurate information about the problem [of counterfeit Alli]" through an ad campaign and by optimizing internet search engine results. Rec., vol IV at 144. The letter explains that GSK employees "collaborate[d] closely with the FDA and other officials on the rapidly evolving crisis" and "cooperated closely with the FDA-OCI in their investigation." *Id.* It also states that "[t]he sales of counterfeit versions of our products threatens not only our hard-earned reputation but potentially imperils the health and safety of patients." *Id.* at 143.

Attached to the letter is a spreadsheet detailing the expenses incurred by GSK as a result of Mr. Zhou's counterfeiting activities, which it describes as "Alli counterfeit management costs." *Id.* at 143. The letter highlights that the expenses shown on the spreadsheet were "out-of-pocket sums" and did not include "the additional personnel time and other internal resources and expenses" the company dedicated to dealing with the counterfeit Alli. *Id.* at 145. Nor did the company seek to actually quantify the "damage to the reputation of the brand caused by Mr. Zhou's activities," *id.*, which presumably would have been very difficult if not impossible. The spreadsheet itself provides the following "project descriptions" for the expenses: "issue management," "website technical

execution," "website development," "extended coverage for 1-800 phone line," "the counterfeit Alli campaign for all three [search] engines," and "omnibus study." *Id.* at 146.

In determining the amount of restitution it ordered Mr. Zhou to pay GSK, the district court adopted the amounts from the spreadsheet, finding

> they [are] the types of expenses that you would anticipate a manufacturer of a FDA approved drug would incur if it realized that someone was out there counterfeiting its product, especially counterfeiting the product in a way that could be harmful to the consumers and therefore not only hurt people, but also severely damage the brand name and as a result all of the trademarks, undercut the good will of the company . . . the fact that the company incurred all those different expenses which amount to quite a bit of money [is] perfectly reasonable.

Rec., vol. II at 121. The district court further found that the restitution was a "direct result of the defendant's activities and the company's reasonable reaction to counterfeit Alli products of the defendant getting into the United States." *Id.* at 121-22.

Mr. Zhou contends the district court erred by ordering restitution for expenses not authorized under the MVRA. "Courts have no inherent power to order restitution; they may only do so as authorized by statute." *United States v. Gordon*, 480 F.3d 1205, 1210 (10th Cir. 2007). The MVRA therefore sets the outer limits on the type of damages that are compensable in this case. We have held that "the MVRA does not provide incidental, consequential, or pain and suffering awards," *United States v. Serawop*, 505 F.3d 1112, 1124 (10th Cir.

-28-

2007), but it does entitle victims to recover losses "'actually caused by the defendant's offense." *Id.* at 1123; *see also United States v. Patty*, 992 F.2d 1045, 1049 (10th Cir. 1993); *United States v. Quarrell*, 310 F.3d 664, 680 (10th Cir. 2002) ("A restitution order must be based on *actual* loss.") (emphasis in original).

Mr. Zhou's main problem on appeal is that he failed to object to the requested restitution for GSK other than the vague general assertion that it was "speculative." He now argues that the restitution for GSK's public relations and other expenses included in the $385,216.75 are consequential in nature and do not fall within the losses covered by § 3663A(b)(1). He also contends the district court erred by accepting GSK's calculation of its expenses without any supporting information from invoices, sworn statements, or the like, and that there was insufficient evidence Mr. Zhou caused these losses. He further asserts that the claimed expenses were not all incurred during participation in the investigation or prosecution of the offense and thus are not authorized for reimbursement under § 3663A(b)(4).

To the extent Mr. Zhou is making a legal argument he failed to raise in district court, we review only for "particularly egregious or obvious and substantial legal error, which our failure to consider would result in a miscarriage of justice." *Patty*, 992 F.2d at 1049 (internal quotation marks omitted). To establish plain legal error, Mr. Zhou must show an error, clear and obvious under current law, that affects substantial rights. *United States v. Hughes*, 191 F.3d

1317, 1322 (10th Cir. 1999).  To the extent Mr. Zhou is attempting to raise unpreserved factual errors, we have held under the plain error standard that failure to assert a factual dispute at sentencing waives the challenge because it prevented the probation officer from reviewing and the district court from resolving the fact issue.  *Overholt,* 307 F.3d at 1253.

We first address Mr. Zhou's assertion that there is no indication the expenses claimed by GSK were "incurred during participation in the investigation or prosecution of the offense" as required by § 3663A(b)(4).  In the district court, Mr. Zhou made no specific objection to the GSK letter or spreadsheet provided by GSK and relied on by the district court.  It is clear from the letter that at least some of the disputed $385,216.75 in expenses were incurred by GSK during participation in the investigation of Mr. Zhou, which was occurring at the same time as GSK's crisis management.  *See, e.g.*, *United States v. Phillips*, 477 F.3d 215, 224-25 (5th Cir. 2007) (affirming MVRA restitution to victim investigating harm from theft of its computer data for expenses incurred notifying other victims and determining extent of damage suffered).  In imposing the restitution order, however, the district court did not mention GSK's role in the government's investigation or make a specific finding that the expenses were incurred during participation in that investigation.  But Mr. Zhou did not object to the requested restitution on this basis.  Whether all of the expenses were incurred by GSK during the government's investigation or prosecution of this matter is a fact

question which Mr. Zhou has waived by his failure to object.

Mr. Zhou also argues that the government failed in its burden to establish he caused all of the claimed damages. Whether the government established causation is a fact issue that Mr. Zhou failed to raise and has thus waived. *See Overholt,* 307 F. 3d at 1253 (defendant's argument that damage to victim's property "came from other sources" is a "purely factual issue[]" and is waived if not raised below).

Mr. Zhou contends in addition that many of the listed expenses are not covered by § 3663A(b)(1), which provides restitution for damage to property. At sentencing, Mr. Zhou did not object to the recommended GSK restitution on the basis that it was not authorized under the MVRA. We therefore review this alleged legal error only if it is clear and obvious under current law, which is the plain error standard he must meet. *Id.*

The district court found that the expenses GSK requested were reasonable and directly related to the damage done by Mr. Zhou to GSK's property through his counterfeiting activities, specifically mentioning that Mr. Zhou's counterfeiting activity was done in a way that would "severely damage the brand name and . . . undercut the good will of the company," indicating that the court was ordering restitution pursuant to § 3663A(b)(1)(B). *See supra* at 28. GSK's property, its registered trademarks for Alli and the reputation and goodwill of the company, was the subject of Mr. Zhou's offense. *See United States v. Shepard*,

269 F.3d 884, 887 (7th Cir. 2001) (restitution under MVRA is limited to the "property subject to the offense") (citing *United States v. Arvantis*, 902 F.2d 489, 497 (7th Cir. 1990)).

Restitution under § 3663A(b)(1)(B) is not limited to damage done to a victim's tangible property; it also includes damage to intangible property. *See, e.g.*, *Overholt*, 307 F.3d at 1254 (noting courts have allowed restitution under MVRA for "purely financial losses," collecting cases); *United States v. Robers*, 698 F.3d at 937, 955 (7th Cir. 2012) (allowing restitution under MVRA for damage to capital in mortgage fraud scheme); *Hosking*, 567 F.3d at 332 (same for damage to capital in embezzlement scheme). Accordingly, the district court properly applied § 3663A(b)(1)(B) to the intangible property of GSK damaged by Mr. Zhou's counterfeiting activities.

District courts have "abundant discretion" in determining the amount of damage done to a victim's property. *Serawop*, 505 F.3d at 1124. We and other courts have held that a restitution order under § 3663A(b)(1)(B) can properly include the cost of cleanup or repair of the damaged property because such costs can serve as an "easily ascertained proxy for the loss sustained by the [victim] as a result of [the defendant's] crimes." *United States v. Barton*, 366 F.3d 1160, 1167 (10th Cir. 2004); *see also Quarrell*, 310 F.3d at 680-81 (affirming MVRA restitution in amount equal to costs incurred repairing archaeological site in national forest) ; *Overholt*, 307 F.3d at 1254 (affirming, under plain error review,

-32-

an MVRA restitution order directing defendants convicted of conspiring to illegally dump petroleum-impacted wastewater to pay Coast Guard's costs of cleaning up pollution caused by defendants); *United States v. Brock-Davis*, 504 F.3d 991 (9th Cir. 2007) ("[C]lean-up or repair costs may be ordered under the MVRA.") (internal quotation marks omitted); *United States v. Quillen*, 335 F.3d 219, 226 (3d Cir. 2003) (holding "clean-up or repair costs may be ordered under the MVRA, provided the defendant is not required to compensate the victim twice for the same loss," collecting circuit court cases).

The expenses listed by GSK in the letter and spreadsheet can be characterized as "cleanup or repair costs" directly related to Mr. Zhou's counterfeiting activities. While the expenses incurred by GSK seeking to mitigate and repair the damage done by Mr. Zhou are not an exact measure of the harm he caused to GSK's property, they serve as an acceptable proxy which is much easier to quantify and verify than the actual damage to GSK's trademarks, reputation, and goodwill. *See Barton*, 366 F.3d at 1167 (instructing district court to order MVRA restitution from defendant convicted of setting fire to inflammable materials on federal lands in amount spent by Forest Service on revegetating burned area despite difficulty in quantifying the actual value of the damage done to the property). Indeed, as noted above, a district court has broad discretion in crafting a restitution order under the MVRA, *Serawop*, 505 F.3d at 1124, and at the sentencing hearing here the district court found the mitigation expenses were

"reasonable" and incurred as "a direct result of the defendant's activities . . . ." Rec., vol. II at 122; *see Patty*, 992 F.2d at 1049 (losses must be "directly related" to defendant's criminal conduct). This damage was thus not incidental or consequential to Mr. Zhou's counterfeiting, but rather, as determined by the district court, was "direct," causing actual losses to GSK. Rec., vol. II at 121.

In sum, although we doubt there was any error at all, we affirm the restitution order "because if there was error, it was not clear or obvious under current law." *Overholt*, 307 F.3d at 1253 (internal quotation marks omitted).

We AFFIRM.